IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

ASOKA PERERA,
    Plaintiff,

vs.                                   Case No.: 5:12cv18/MMP/EMT

MARCUS GRANTHAM, et al.,
       Defendants.
_____/

## REPORT AND RECOMMENDATION

This cause is before the court on Defendants' Motion to Dismiss Plaintiff's Action for Failure to Exhaust Administrative Remedies (doc. 44).[1] Plaintiff filed a response to the motion, after receiving an extension of time in which to do so (*see* docs. 56, 57). The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2; *see also* 28 U.S.C. § 636(b) and Fed. R. Civ. P. 72(b). After a careful review of the record and the arguments presented, it is the opinion of the undersigned that Defendants' motion should be denied.

Background

Plaintiff, an inmate in the Florida Department of Corrections ("DOC")[2] proceeding pro se, initially filed this action pursuant to 42 U.S.C. § 1983 in January of 2012 (doc. 1). He filed a second amended complaint on July 19, 2012, in which he named Marcus A. Grantham, Walter Robinson, Franklin Hagen and John Doe as Defendants (doc. 12). Plaintiff alleged violations of his civil rights stemming from a serial sexual and physical assault by Defendants Grantham, Robinson and Doe on

---

[1] Although the motion was initially filed by Defendants Hagen and Robinson only, Defendants Segers and Grantham adopted the motion after they were served (docs. 50, 54).

[2] Plaintiff was initially received in DOC custody on December 20, 2010, for the first time at the age of forty-six. *See* http://www.dc.state.fl.us/ActiveInmates/detail.asp?Bookmark=1&From=list&SessionID=761448236.

January 13, 2011, and a physical assault by Defendant Hagen on January 20, 2011 (doc. 12 at 7–9). On December 3, 2012, Plaintiff informed the court that the John Doe Defendant was Captain Randall B. Segers (doc. 32), and Plaintiff subsequently filed a third amended complaint (doc. 42), which is the operative pleading in this case.

Plaintiff alleges that on January 13, 2011, two days after his arrival at Calhoun Correctional Institution ("CCI"), he got up to use the restroom in the early morning and was confronted by Defendant Grantham, who ordered Plaintiff to go to the laundry room (doc. 42 at 6). When Plaintiff entered the laundry room, Grantham "called for Defendant Robinson" to join them (*id.*). Grantham then ordered Plaintiff to look forward and put his hands up and against the wall (*id.*). Next, Grantham placed a pillowcase over Plaintiff's head, pulled down Plaintiff's pants and boxer shorts, and anally penetrated Plaintiff with his penis (*id.* at 7). Robinson and Segers, who had entered the laundry room during the assault, then each raped Plaintiff in turn (*id.*). After the three assaults, Plaintiff collapsed to the floor where Grantham and Robinson began to repeatedly kick him (*id*). Plaintiff states that he blacked out, and when he came to, the pillowcase had been removed from his head and Grantham and Robinson were still kicking him and ordering him to "Get the fuck up, Arab motherfucker!" (*Id.*). Segers left the laundry room while Grantham and Robinson were still kicking Plaintiff (*id.*). Plaintiff crawled to the door and pulled himself to his feet, when he noticed that his anus was bleeding (*id.*). He then pulled up his boxer shorts and trousers (*id.*). Grantham and Robinson threatened Plaintiff, told him not to tell anyone about what had happened, and said that they would be watching him (*id.* at 8). Plaintiff went back to his dorm and placed the blood-stained boxer shorts in a bag in the back of his locker (*id.*). That morning, Robinson retrieved the boxer shorts and again warned Plaintiff not to get the officers in trouble (*id.*).

Plaintiff called his wife on January 15, 2011, and he told her about the sexual assault (doc. 42 at 8). Plaintiff's wife called CCI three days later and spoke to a Captain about additional clothing Plaintiff did not receive at intake, but she did not tell the Captain about the alleged assault for fear that Grantham and Robinson would retaliate against Plaintiff (*id.*). On January 20, 2011, Defendant Hagen ordered Plaintiff to report to the laundry department (*id.*). When Plaintiff arrived, Hagen told Plaintiff to tell his wife to quit calling the Captain about his clothes and then took out a pair of handcuffs which

he used to hit Plaintiff's penis after Plaintiff inquired about what he had done wrong (*id.*). Plaintiff's penis was bleeding after the assault, and it continued to bleed when he urinated (*id.* at 9).

On January 22, 2011, Plaintiff called his wife and told her that his right leg was injured (doc. 42 at 9). On January 24, 2011, Plaintiff reported to sick call where he complained about swelling in his groin and leg, but he did not tell the nurse about the sexual assault for fear of retaliation (*id.*). While in the waiting room, he told a correctional officer about the handcuff assault, and she reported it to a Captain, who placed Plaintiff in Administrative Confinement ("AC") pending investigation (*id.*). Plaintiff was advised that nothing could be done about his penis (*id.*). The following day Plaintiff declared a medical emergency regarding his penis, and on January 26, 2011, he was threatened by an unknown correctional officer who warned Plaintiff that he would be killed if he continued to talk to anyone about what happened (*id.*).

On January 27, 2011, after examination by a physician, Plaintiff was advised that he would be transported to the Reception and Medical Center ("RMC") for assessment (doc. 42 at 9). Around this time, two unknown correctional officers again harassed and threatened him (*id.*).

On January 28, 2011, Plaintiff was taken from his cell to meet with Inspector Harrison (doc. 42 at 10). The officer who transported Plaintiff threatened him and warned him not to say anything (*id.*). When speaking with Harrison, Plaintiff relayed information about Hagen's assault with the handcuffs but did not say anything about the sexual assault because of the threats (*id.*). Harrison took Plaintiff to the medical department, and because the doctor did not know how to treat Plaintiff's wounds Plaintiff was apparently scheduled for a transfer (*see id.*). Harrison told Plaintiff that he would remain in AC until he was transferred (*id.*). Despite this assurance, Plaintiff was released from AC on January 31, 2011, and assigned to the same dorm (*id.* at 10). When Plaintiff reported to the laundry department for his clothing, Hagen allegedly told him that he had better "watch [his] back" (*id.*).

Plaintiff's wife contacted the Secretary of the DOC on February 2, 2011, and spoke to Inspector Sheen (doc. 42 at 10).

On February 17, 2011, Plaintiff was transferred to the RMC, where he explained to the intake nurse for the first time about the sexual assault and kicking; he also reported the handcuff assault (doc. 42 at 10). The doctor examined Plaintiff's penis and found nothing wrong, but did not examine

Case No.: 5:12cv18/MMP/EMT

Plaintiff with respect to injuries sustained during the sexual assault and kicking (*id.*). Three days later, Plaintiff returned to the emergency room ("ER") at RMC where he again shared details of both assaults (*id.*). Again, he was not examined with respect to the sexual assault and kicking, although he was issued a jock strap and cream for his penis injury (*id.*).

On March 7, 2011, Plaintiff spoke with inspectors at RMC after his wife called the DOC again (doc. 42 at 11). On March 9, 2011, Plaintiff reported to the ER at RMC for an administrative assessment (*id.*). Mr. Folsom, an Internal Inspector General, contacted Plaintiff's wife via email and told her that "there was medical evidence of an assault" (*id.*). Plaintiff asserts that his anus bled for approximately twelve weeks following the assault, and his penis bled for approximately ten weeks after he was hit in the groin with handcuffs by Defendant Hagen (*id.*). He further claims that he has permanent nerve damage to his right leg due to Grantham and Robinson repeatedly kicking him and that he is now confined to a wheelchair (*id.*). He seeks declaratory and monetary relief (*id.* at 12).

Defendants moved to dismiss the third amended complaint on January 4, 2013, due to Plaintiff's failure to exhaust his administrative remedies (doc. 44). It is this motion that is now before the court. The court finds that although Plaintiff technically failed to exhaust his administrative remedies, those remedies were "unavailable" to him due to the actions of Defendants and others. Therefore, dismissal is not warranted.

<u>Analysis</u>

The Prison Litigation Reform Act ("PLRA"), title 42 U.S.C. § 1997e, *et seq.*, provides in relevant part that "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion of all available administrative remedies is a mandatory precondition to suit. *See* <u>Booth v. Churner</u>, 532 U.S. 731, 739 (2001); *see also* <u>Porter v. Nussle</u>, 534 U.S. 516, 524–25 (2002) ("Beyond doubt, Congress enacted § 1997e(a) to reduce the quantity and improve the quality of prisoner suits; to this purpose, Congress afforded corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case."); <u>Parzyck v. Prison Health Serv., Inc.</u>, 627 F.3d 1215, 1217 (11th Cir. 2010); <u>Alexander v. Hawk</u>, 159 F.3d 1321, 1325–28 (11th

Cir. 1998).[3] The exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong. Porter, 534 U.S. at 524. Exhaustion is required whether the plaintiff seeks declaratory and injunctive relief, monetary damages, or both. Booth, 532 U.S. at 741; *see also* Zolicoffer v. Scott, 55 F. Supp. 2d 1372, 1375 (N.D. Ga. 1999), *aff'd*, 252 F.3d 440 (11th Cir. 2001). The requirement is not subject to either waiver by a court or futility or inadequacy exceptions. *See* Booth, 532 U.S. at 741 n.6; *see also* McCarthy v. Madigan, 503 U.S. 140, 144 (1992) ("Where Congress specifically mandates, exhaustion is required."); Alexander, 159 F.3d at 1325. Moreover, the PLRA requires "proper exhaustion," so that the agency addresses the issues on the merits. Woodford v. Ngo, 548 U.S. 81, 92 (2006); *see also* Woodford, 548 U.S. at 95 ("The benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance. The prison grievance system will not have such an opportunity unless the grievant complies with the system's critical procedural rules."). Failure to have properly exhausted administrative remedies "is tantamount to failure to have stated a claim upon which relief may be granted." Rivera v. Allin, 144 F.3d 719, 731 (11th Cir. 1998) (*overruled on other grounds* by Jones v. Bock, 549 U.S. 199, 215–16 (2007)). Therefore, a complaint is subject to dismissal if the court determines that Plaintiff failed to exhaust his administrative remedies with respect to his claims prior to filing suit. Higginbottom v. Carter, 223 F.3d 1259, 1261 (11th Cir. 2000); Alexander, 159 F.3d at 1325–26.

Florida regulations establish a three-step grievance process within state institutions that includes an informal grievance, formal grievance, and appeal to the office of the Secretary of the

---

[3] The purpose of this exhaustion requirement is to reduce the quantity and improve the quality of prisoner suits. Porter, 534 U.S. at 524. In Alexander, the Eleventh Circuit noted the following seven policy reasons favoring exhaustion:

(1) to avoid premature interruption of the administrative process;
(2) to let the agency develop the necessary factual background upon which decisions should be based;
(3) to permit the agency to exercise its discretion or apply its expertise;
(4) to improve the efficiency of the administrative process;
(5) to conserve scarce judicial resources;
(6) to give the agency a chance to discover and correct its own errors; and
(7) to avoid the possibility that "frequent and deliberate flouting of the administrative processes could weaken the effectiveness of an agency by encouraging people to ignore its procedures."

*Id.* at 1327 (quoting Kobleur v. Group Hospitalization and Med. Servs., Inc., 954 F.2d 705, 712 (11th Cir. 1992)).

Case No.: 5:12cv18/MMP/EMT

DOC. *See* Fla. Admin. Code rr. 33-103.005 to 103.007 (2003). If an inmate is filing a medical grievance, he may bypass use of an initial informal grievance and begin his medical complaint with a formal grievance, submitted on Form DC1-303, at the institutional level. *See* Fla. Admin. Code rr. 33-103.006(1), (3)(e), 33-103.008, 33-103.019. If the inmate is dissatisfied with the result of the medical formal grievance (for example, if it is denied), the inmate may obtain further administrative review by submitting an appeal to the Central Office. *Id.* at rr. 33-103.006(7), 33-103.007(1). If an inmate is filing certain grievances such as an emergency grievance or a grievance of reprisal, he may bypass use of informal and formal grievances and begin his complaint with a direct grievance to the Central Office. *Id.* at r. 33-103.007(6)(a).

In Bryant v. Rich, 530 F.3d 1368 (11th Cir. 2008), the Eleventh Circuit outlined the procedure district courts should follow when presented with a motion to dismiss for failure to exhaust. The court held that the defense of failure to exhaust should be treated as a matter in abatement and not an adjudication on the merits. *Id*. at 1374–75. "This means that procedurally the defense is treated 'like a defense for lack of jurisdiction,' although it is not a jurisdictional matter." Turner v. Burnside, 541 F.3d 1077, 1082 (11th Cir. 2008) (quoting Bryant, 530 F.3d at 1374). Because exhaustion is a matter in abatement, "it should be raised in a motion to dismiss, or be treated as such if raised in a motion for summary judgment." Bryant, 530 F.3d at 1374–75 (citation and internal quotation omitted). Where exhaustion is treated as a matter in abatement and not an adjudication in the merits, it is proper for the district court to consider facts outside of the pleadings and resolve factual disputes so long as the factual disputes do not decide the merits, and the parties have sufficient opportunity to develop a record. *Id.* at 1376.

Deciding a motion to dismiss for failure to exhaust administrative remedies involves two steps. Turner, 541 F.3d at 1082. First, the court looks to the factual allegations in Defendants' motion, and those in Plaintiff's response, if any. *Id*. If they conflict, the court accepts Plaintiff's version as true. "If, in that light, the defendant is entitled to have the complaint dismissed for failure to exhaust administrative remedies, it must be dismissed." *Id.*; *see also* Bryant, 530 F.3d at 1373–74. If the complaint is not subject to dismissal at the first step, "the court proceeds to make specific findings in order to resolve the disputed factual issues related to exhaustion." Turner, 541 F.3d at 1082 (citing Bryant, 530 F.3d at 1373–74, 1376). "The defendants bear the burden of proving that the

plaintiff has failed to exhaust his available administrative remedies." *Id*. Upon making findings on the disputed issues of fact, the court then decides whether, under those findings, the plaintiff has exhausted his available administrative remedies.[4]

Based on the parties' submissions, the court makes the following findings. Defendants contend, and Plaintiff does not dispute, that although Plaintiff alleges that he spoke to numerous people at various institutions concerning the alleged incidents, he never actually used the available grievance process (*see* doc. 42 at 6–12). In support of their contention, Defendants submitted declarations of Sherry Prince and Rebecca Padgham, both of which were signed as true and correct under penalty of perjury (doc. 44, exhs. B, C). Ms. Prince states she is employed by the DOC as a sentence specialist at Hamilton Correctional Institution Annex (doc. 44, exh. B, Prince Declaration ¶ 1). Ms. Prince states that she reviewed Plaintiff's inmate file and found no grievances alleging that he was raped by correctional officers on or about January 13, 2011, or any other grievances pertaining to sexual assault (*id*., ¶ 2). Ms. Padgham is employed as a Correctional Services Assistant Consultant (doc. 44, exh. C, Padgham Declaration ¶ 1). Ms. Padgham states that she reviewed the available grievance appeal records for Plaintiff kept in the DOC's Central Office from January 13, 2011, through January 25, 2012 (*id.* ¶ 2). Ms. Padgham's review revealed no record of Plaintiff's having filed a grievance appeal in which he alleged that he had been raped by correctional officers on or about January 13, 2011 (*id.*).

The law of the Eleventh Circuit is clear that the PLRA requires proper exhaustion through the administrative grievance procedure created by the agency (the Florida DOC), including compliance with the agency's deadlines and other critical procedural rules. *See* Brown v. Sikes, 212 F.3d 1205, 1207 (11th Cir. 2000) (holding that "when a state provides a grievance procedure for its prisoners, . . . an inmate alleging harm suffered from prison conditions must file a grievance and exhaust the remedies available under that procedure before pursuing a § 1983 lawsuit"); *accord* Woodford, 548 U.S. at 94 ("Requiring proper exhaustion . . . gives prisoners an effective incentive to make full use

---

[4] Although the court previously advised the parties that Defendants' motion to dismiss would be converted to one for summary judgment, the court declines to do so in light of the procedures set forth in Bryant and Turner, *supra*. The court thus proceeds to treat Defendants' motion as a motion to dismiss, but in doing so the court will—as it is permitted to do—consider facts outside the pleadings. *See* Bryant, 530 F.3d at 1374–75; *see also, e.g.*, Tilus v. Kelly, No. 12-12216, 2013 WL 692703 (11th Cir. Feb. 26, 2013).

of the prison grievance process and accordingly provides prisons with a fair opportunity to correct their own errors. This is particularly important in relation to state corrections systems because it is "difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons."). In this case, Plaintiff made no attempt to comply with the DOC's grievance procedures (doc. 44, exhs. A, B); Woodford, 548 U.S. at 90–91 ("Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings).

      This finding alone, however, does not mandate dismissal of this action. The Eleventh Circuit has held that "a prison official's serious threats of substantial retaliation against an inmate for lodging in good faith a grievance make the administrative remedy 'unavailable,'" and in such cases "the exhaustion requirement as to the affected parts of the [grievance] process" may be lifted. Turner v. Burnside, 541 F.3d 1077, 1085 (11th Cir. 2008). A remedy is deemed "unavailable" when "(1) the threat actually did deter the plaintiff inmate from lodging a grievance or pursuing a particular part of the process; and (2) the threat is one that would deter a reasonable inmate of ordinary firmness and fortitude from lodging a grievance or pursuing the part of the grievance process that the inmate failed to exhaust." *Id*. (citing Hemphill v. New York, 380 F.3d 680, 688 (2d Cir. 2004); Smith v. Mosley, 532 F.3d 1270, 1277 (11th Cir. 2008)); *see also* Tilus v. Kelly, No. 12-12216, 2013 WL 692703 (11th Cir. Feb. 26, 2013) (citing Turner).

      As justification for his failure to use the grievance process, Plaintiff asserts that he was intimidated by Defendants and other correctional officers who threatened him, and he provides numerous examples of specific instances where he was threatened (doc. 57, exh. 1 at 1–4). For instance, Plaintiff alleges that Grantham and Robinson told Plaintiff immediately after the assault to keep his mouth shut and that they would be watching him (doc. 42 at 8, ¶ 15; doc. 57, exh. 1 at 1–2). He asserts that Robinson came to his dormitory and removed Plaintiff's soiled boxer shorts from Plaintiff's footlocker and warned him not to get the officers in trouble (doc. 42 at 8, ¶ 17). Plaintiff states that when he saw the nurse on January 24, 2011, he did not tell her about the assaults out of fear of retaliation from Grantham, Robinson and Hagen (*id.* at 9, ¶ 26; doc. 57, exh. 1 at 2). He also states that on or about January 26, 2011, an unknown correctional officer threatened that Plaintiff would be

killed if he continued to talk about what had happened (doc. 42 at 9, ¶ 30; doc. 57, exh. 1 at 3). He alleges he was threatened again on or about January 28, 2011, and before he met with Inspector Harrison (doc. 42 at 10, ¶ 33; doc. 57, exh. 1 at 3). Plaintiff states he did not tell Inspector Harrison about the sexual assault when the two men met because of the threat he received immediately prior to this meeting by the correctional officer who escorted him to the meeting (doc. 42 at 10, ¶ 36). After the meeting, Plaintiff was returned to AC where officers told Plaintiff that they hoped he had not talked to the inspector (doc. 57, exh. 1 at 3). Three days later, Plaintiff was released from AC and returned to the same dormitory where he had been raped and beaten (*id*.). He was also required to return to the laundry room, the actual scene of the assault, where Defendant Hagen told Plaintiff that he had "better watch [his] back" (doc. 57, exh. 1 at 4). Plaintiff states that between February 3, 2011 and February 15, 2011, he was repeatedly threatened by the officers who had raped him in January 2011 (*id.*). It was only on February 17 and again on February 20, 2011, after his transfer to the RMC, that Plaintiff finally informed medical personnel about the sexual assault, although he contends he received no examination or treatment (doc. 42 at 10, ¶ 41, 42).

Defendants maintain that to the extent Plaintiff might assert that he was intimidated by his attackers and had no available remedy, such an assertion is not credible. They note that Plaintiff was in contact with individuals at more than one institution who might have provided Plaintiff with a grievance form or turned in a completed grievance form for him (*see* doc. 42 at 8–11). Defendants further note that Plaintiff also had Fla. Admin. Code r. 33-103.007(6) and r. 33-103.006(8)(e) at his disposal. The former rule provides that certain grievances may be filed directly with the Secretary,[5] and the latter provides that an inmate who elects to submit his grievance directly to the Central Office may do so by placing the grievance in a sealed envelope to be placed in the institutional bulk mail. Under the latter rule, institutional staff is not permitted to read the grievance that is sent. Direct grievances to the Office of the Secretary must be "received within 15 calendar days from the date on which the incident or action which is the subject of the grievance occurred." Fla. Admin. Code r. 33-103.011(1)(d).

---

[5] Such grievances are limited to "emergency grievances and grievances of reprisals, protective management, admissible reading material, grievances concerning sentence structure . . . or inmate banking issues" and grievances alleging a violation of the Health Insurance Portability and Accountability Act ("HIAA"). 33 F.A.C. 33-103.007(6)(a).

Defendants also argue that to the extent Plaintiff might argue that his verbal complaints to his wife about the incident constituted some sort of exhaustion, he is mistaken, citing a recent recommendation entered by the undersigned. *See* Vinci v. Culpepper, No. 3:10cv173/MCR/EMT, 2012 WL 3155618, at *4 n.2 (N.D. Fla. July 13, 2012). In Vinci, Plaintiff alleged that he was sleeping in his bunk when he was attacked by another inmate (case no.: 3:10cv173/MCR/EMT, doc. 51 at 6–7). He complained verbally to several individuals about the incident, the lack of subsequent medical treatment, and about the fact that a correctional officer was allegedly sleeping on the job at the time of the assault (*id.* at 6–7, 8, 10). Plaintiff's wife complained to DOC staff about the lack of medical treatment he was receiving and, as a result, plaintiff was "interviewed" by a lieutenant at the facility (*id*. at 9–10). He was allegedly assaulted by correctional officers as a result of his complaints (*id.* at 10), and again he made only verbal complaints about the assault (*id.* at 11, 12). Defendants moved to dismiss based on plaintiff Vinci's failure to exhaust his administrative remedies. The undersigned recommended that the motion be granted, noting that plaintiff's verbal complaints and the complaints of his wife were insufficient to satisfy the exhaustion requirement. Vinci, No. 3:10cv173/MCR/EMT, 2012 WL 3155618, at *4 n.2 (citing Schlicher v. Fla. Dep't of Corr., 399 F. App'x 538 (11th Cir. 2010) (rejecting prisoner's arguments that the efforts he made, including writing letters to the Secretary of the DOC, a federal judge, and the inspector general, and making verbal complaints to various prison officials, were sufficient to satisfy the exhaustion requirement)). The court finds that Vinci, however, is distinguishable because in Vinci nothing further ensued after the "interview" with the lieutenant. Thus, there was no meaningful investigation of Vinci's allegations within the DOC before Vinci filed his complaint. Furthermore, Vinci never specifically alleged that he was fearful of pursuing his administrative remedies, but rather that Warden Culpepper and other DOC officials "thwarted" his efforts to do so (*see* case no.: 3:10cv173/MCR/EMT, doc. 82 at 1).

As previously noted, Plaintiff in this case told his wife about the sexual assault and she contacted the Secretary of the DOC and spoke to Inspector Sheen (doc. 42 at 8, ¶ 18 and at 10, ¶ 40). It is clear even from Plaintiff's complaint that there was at least some formal investigation into his allegations, as Plaintiff asserts that "Mr. Folsom, an Internal Inspector General, contacted Plaintiff's wife by e-mail and he indicated that there was medical evidence of an assault" (doc. 42 at 10, ¶ 45).

Moreover, Defendants have appended a Report of Investigation from the Office of the Inspector General to their motion to dismiss (doc. 44, exh. A).[6]

The Report of Investigation indicates that Plaintiff gave a sworn statement to Inspector Harrison on January 28, 2011, who contacted him in response to a phone call from Plaintiff's wife (doc. 44-1 at 3). At that time, Plaintiff denied that he had been sexually assaulted or abused by either an inmate or a staff member, stating only that he had been hit in the groin and therefore felt like his manhood had been taken away (doc. 44-1 at 3). Plaintiff's denial can be explained by his assertion that he was threatened immediately before this meeting (*see* doc. 57-1 at 3) and that he remained at the same institution as the alleged assailants. On March 7, 2011, Plaintiff gave a sworn statement to Inspector Allen at the RMC in which he detailed the forcible sexual assault by Defendants Grantham, Robinson and Segers much as it is described in the complaint in this case (doc. 44-1 at 3). In conjunction with the report, the three Defendants were interviewed separately and each gave a statement denying having sexually assaulted or having witnessed anyone sexually assault Plaintiff (*id.* at 3–4). Inmate Yaqub Faheem gave a statement indicating that Plaintiff had asked Faheem to give a false statement saying that Faheem had overheard the assault, and to falsify another document in reference to Defendant Hagen kicking Plaintiff in the groin (*id.* at 4). Faheem refused to do so (*id.*).

The report further reflects that on June 13, 2011, a synopsis of the case was presented to Gary Pack, Assistant State Attorney for the 14th Judicial Circuit (doc. 44-1 at 5). After reviewing the case, Mr. Pack declined to prosecute due to "there being no physical evidence, Inmate Perera initially denying the incident and failing to report it for three [sic] months" (*id.*).

As previously noted, the case law is generally unequivocal that an inmate's failure to exhaust his or her administrative remedies mandates dismissal. And as also previously noted, in addition to the ordinary three-tiered grievance process, there were grievance procedures in place that Plaintiff could have used in an attempt to avoid alerting his alleged assailants about his filing. However, Plaintiff has detailed the multiple serious threats he received and his state of mind at the time (*see* doc. 57-1). The court finds that this pattern of intimidation would have deterred an inmate of ordinary

---

[6] In contrast to the information allegedly provided to Plaintiff's wife, however, that report reflects that "[n]o physical evidence could be obtained due to the delay in reporting the alleged incident and the alleged victim previously provided a sworn statement that he had not been sexually assaulted" (doc. 44-1 at 2).

Case No.: 5:12cv18/MMP/EMT

firmness from reporting the alleged sexual assault. *See* Hemphill, 380 F.3d at 688 ("The test for deciding whether the ordinary grievance procedures were available must be an objective one: that is, would 'a similarly situated individual of ordinary firmness' have deemed them available.") (citation omitted). Stated another way, a similarly situated individual as Plaintiff—that is, a forty-six year old inmate who had come into DOC custody for the first time less than one month before an alleged sexual assault by three different correctional officers, and who had been repeatedly warned not to report the sexual assault—would have been deterred from reporting what had happened until after he was transferred to another institution. *See* Turner, 541 F.3d at 1085. Finally, the record supports a finding, as Plaintiff has sworn to under oath (*see* doc. 57-1), that threats and fear of retaliation actually did deter Plaintiff from utilizing the DOC's grievance process. Under these circumstances, the administrative remedy process was "unavailable" to Plaintiff and, correspondingly, the exhaustion requirement must be "lifted."[7] *Id.* at 1084–85. Finally, the court notes that the policy reasons for exhaustion set forth in Alexander (*see* n.3, *supra*) were satisfied to a great extent by the subsequent investigation into Plaintiff's allegations of sexual assault by the Office of the Inspector General.

Accordingly, it is respectfully **RECOMMENDED**:

That Defendants' motion to dismiss (doc. 44) be **DENIED**.

At Pensacola, Florida, this 5th day of April 2013.

/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**

---

[7] The Report of Investigation did not specifically investigate or address the alleged assault by Defendant Hagen. However, because Plaintiff's affidavit clearly indicates that Plaintiff feared retaliation from Hagen (doc. 57-1 at 2), that he was told not to tell anyone about the "rape *or assault*," and that Hagen had threatened him (doc. 57-1 at 2, 3, 4), the court finds that the administrative remedy process was unavailable with respect to this incident as well.

## NOTICE TO THE PARTIES

Objections to these proposed findings and recommendations may be filed within fourteen (14) days after being served a copy thereof. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only</u>. A copy of objections shall be served upon the magistrate judge and all other parties. Failure to object may limit the scope of appellate review of factual findings. *See* 28 U.S.C. § 636; <u>United States v. Roberts</u>, 858 F.2d 698, 701 (11th Cir. 1988).